UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10165-RGS

VERIZON NEW ENGLAND, INC.

v.

LOCAL NO. 2322, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

August 20, 2010

STEARNS, D.J.

Plaintiff Verizon New England, Inc. (Verizon) brought this lawsuit pursuant to section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 141, et seq., for the alleged breach of a collective bargaining agreement (CBA) by defendant Local 2322, International Brotherhood of Electrical Workers (IBEW or Union). The dispute centers on certain "self-help" measures undertaken by Union members. The IBEW moved for summary judgment on April 30, 2010. A hearing was held on August 6, 2010.

BACKGROUND

The facts in the light most favorable to Verizon as the non-moving party are as follows. IBEW is an international union representing members of affiliated local unions in the United States and Canada, including a number of employees of the former American Telephone and Telegraph Company (AT&T) and its successor companies, including Verizon. Approximately 1,000 Verizon employees located in southeastern Massachusetts and Cape Cod, from Provincetown to Brockton and Fall River, are members of IBEW Local

2322, which has its headquarters in Middleboro, Massachusetts.[1] Verizon seeks relief for four alleged breaches of the CBA: (1) a refusal to comply with equipment rules; (2) a work stoppage; (3) unauthorized picketing; and (4) a concerted refusal to volunteer for overtime work. The first alleged breach involves communications from a Chief Steward to Union members in late 2008 and early 2009. The other three alleged breaches stem from the suspension and termination of a Union employee in August of 2009.

I. Threats to Prevent Carrying of Company-Issued Tools (October 2008/January 2009)

Beginning in late 2008, Verizon issued cell phones with GPS functionality to Equipment Installation Technicians (EI Techs). Because EI Techs typically work at remote sites, Verizon requires them to be in constant touch with their supervisors. The cell phones were issued as a replacement for the pagers previously carried by EI Techs. Simultaneously, Verizon revised its work rules to accommodate the cell phones. The prior rule stated that "[t]he company issued tool kit must be on the job site with the employee." Santos Aff. ¶ 13, Ex. F at 5. The new rule (effective October 2008) stated that "[t]he company issued tools (laptop, tool kit, and phone) must be on the job site with the employee. Employees are required to transport company-issued tools between job sites." Id. ¶ 13, Ex. G at 2.

Union employees were concerned that the GPS tracking function would be used to monitor them not only at work but also during their personal time. Two employees who

---

[1] Verizon notes that while Local 2322's membership consists of roughly 1,000 employees, its bargaining power is much greater because of a joint representation agreement with the five other IBEW locals in Massachusetts and Rhode Island (the T-6 Council).

refused to carry the company-issued cell phones were disciplined.[2] The Union grieved both cases. Union members sympathetic to the disciplined employees began to consider other means of protest. In late October of 2008, Katherine Crowley, the Chief Steward[3] for the EI Techs, approached Eugene McLaughlin, then the Business Manager of Local 2322, and asked if EI Techs could fashion their own work rules. McLaughlin responded, "Yes, you can create your own work rules." Crowley Dep. at 138. Crowley was also told by Chris Jolls, Local 2322's Treasurer and Assistant Business Manager, that "if people didn't follow the [Union] work rules they could be subject to appear in front of the T-6 Council, and there could be a fine." Id. at 123.

With input from other employees, Crowley proceeded to draft her own set of "EI Work Rules." These were adopted by the membership at the Union's monthly meeting in October of 2008. One of Crowley's work rules read as follows:

> It is the Unions [sic] position that each employees' [sic] membership under contract requires that we appropriate [sic] wage [sic] for any work function performed. Which [sic] translates that [sic] we get paid to travel and or transport any company tool. If the employee chooses to carry the laptop, phone and black toolkit on personal time they must be paid for it. You are to put in for 1 hour O.T. and a travel allowance. If you are denied the O.T. and allowance by the company, this must be grieved. This is not negotiable and is contractual [sic]. All other tools will be transported via manager, company mail, or courier.

---

[2]Two deposition witnesses recalled a third employee being disciplined, but no corroborating records have been produced. Def.'s SOF ¶ 23 & n.1.

[3]"[T]he official Union Steward is often the face of the union to other members and to the company. He [or she] is a chief enforcer of the contract and members' representative to management." IBEW, Union Steward Help, http://www.ibew.org/union/steward/index.htm (last visited August 4, 2010).

Def.'s Statement of Facts (SOF) - Ex. 11.  On January 8, 2009, Crowley sent a notice to Union employees stating that the work rules that she had drafted were in effect and would be enforced.

> The decision has been made to enforce the union E.I. Work Rule number one in regard to the tools.  The union stance is as follows, ***do not transport any tools (except for the 3 items under protest)*** for the manager's [sic].  If you do, there will be consequences for doing so.  You could be subject to answer to the T6 council for your actions and a possible fine that would far exceed a travel allowance reimbursement.  This is happening because of the managers [sic] continued harrassment [sic] of the work force [sic] not because anybody has done anything wrong.  The excuse that you did not get this email is not acceptable.  Everybody knows that the department is a grapevine.

Def.'s SOF - Ex. 12 (emphasis in original).  Although the Union leadership was not consulted about the e-mail and later warned Crowley against sending similar messages in the future, no formal retraction was issued by the Union.  Aside from a Union employee who was "talked to" by other Union members for following Verizon's work rules instead of the Union version (Crowley Dep. at 136-137), there is no evidence that either Verizon (aside from the two employees mentioned in footnote 2) or the Union ever sanctioned any employee for violating either rule.

II. <u>Altercation and Employee Discipline Leading to Protests (August 2009)</u>

At 7:00 p.m. on August 25, 2009, Patricia Regan, a second-level supervisor, observed three vehicles parked in a "peculiar" manner outside Verizon's Brockton garage, including a company truck.  Opp'n - Ex. B at 6.  She approached the vehicles with a camera, intending to document what she had seen.  As she neared the vehicles, she recognized Peter Sem, a Verizon technician and Local 2322 member.  Sem was carrying an open beer can in his right hand and reeked of alcohol.  Sem surprised Regan by

4

suddenly striking her arm causing her to lose her grip on the camera, which fell to the ground. As Regan reached down for the camera, Sem began to push her "violently," while trying to step on and "mutilate" the camera. Id. The altercation lasted approximately five minutes. Regan told Sem that he "was done" and demanded his keys and Verizon ID. Id. at 7. As she went to retrieve a Verizon laptop from the back of Sem's truck, he pushed her again. She then demanded his company phone. Sem asked if he would be disciplined, and she replied that he would be suspended for "drinking on company time and on company property and also for assaulting a manager." Id. at 7-8.

Regan filed an application for a criminal complaint against Sem for assault and battery and malicious destruction of property at Brockton District Court the next day. The complaint issued on October 7, 2009. The criminal case was resolved on May 13, 2010, when Sem agreed to a term of pre-trial probation and payment of restitution for the damaged camera.[4] Sem was suspended by Verizon and ultimately fired for his role in the altercation. Regan remained a supervisor.

    a.    Work Stoppage

Union members at the Brockton garage were upset by the perceived "disparate treatment" of Sem and Regan. Def.'s SOF ¶ 40. On August 28, 2009, when first-level supervisors assembled EI Techs to distribute work assignments at the beginning of the 7:30 a.m. shift, the employees refused to work. Instead, they demanded to speak with the third-level supervisor, Lance Cummings. First-level supervisor Michael Shea spoke with Robert

---

[4] Sem and the Union dispute that Sem was the aggressor and note that no admission to sufficient facts or a plea of guilty was entered. Verizon argues that Sem pled *nolo contendere* (no contest) to the facts alleged in the complaint. Pl.'s SOF ¶ 39. However, no such admission of guilt appears in the record. See Reply - Ex. 1 at 3. See also Mass. Gen. Laws ch. 276, § 87 (pretrial probation in contemplation of dismissal).

Wall, the garage's Chief Steward, about the work stoppage. Wall claimed that Union members felt "unsafe" around Regan and would not return to work until they had spoken with Cummings. Opp'n at 7. Shea replied that Cummings would not come to the garage and that the Union employees had to return to work. After forty-five minutes, the El Techs had still not left the garage. Shea issued an ultimatum that employees who did not leave for their work sites within the next five minutes would be suspended. During this five-minute window, Shea called Eric Hetrick, the new Local 2322 Business Manager, to inform him of the standoff. While a few Union employees who were on final warning for past transgressions complied with Shea's order, most remained at the garage in what Verizon characterizes as a "sit-down" strike. Hetrick requested that Shea hold off on imposing sanctions until he arrived at the garage. When he did, Hetrick did not speak to the striking employees, but instead called Cummings directly. He suggested that Regan not interact with Union members until a representative of the Employee Assistance Plan could meet with them the following week to discuss their fears of Regan. The proposal was accepted by Cummings. By Verizon's estimate, the strike cost between an hour and an hour-and-a-half of the work day at the garage.[5]

    b. <u>Voluntary Overtime</u>

On the same day as the work stoppage took place, Union employees at the Brockton garage who had previously volunteered to work overtime refused any further assignments. Union employees at other Verizon garages began following suit until by September 3, 2009, no Local 2322 members were willing to take voluntary overtime. On August 28, 2009, Hetrick responded to a Verizon inquiry about the Union's efforts, if any,

---

[5]The Union places the duration of the work stoppage closer to a half-hour.

to put a stop to the overtime boycott, stating that "the Union has satisfied its contractual obligations since it has not caused or permitted its members to take part in a strike or other interference with Company operations."  Santos Aff. - Ex. K.

    c. Picketing

On September 1, 2009, approximately twenty Union members picketed in front of the Brockton garage in further protest of the disciplining of Sem among other complaints. Workers stood or walked between the two entrance gates, but did not block traffic or prevent other workers from entering the garage.  No flyers were distributed, but some workers did carry picket signs.  The Union denies that it organized the picketing, but acknowledges that Union leaders (Hetrick among them) participated.  The picketing persisted for several weeks from 7:15 a.m. to 7:30 a.m. at the beginning of the work day. Verizon requested that Local 2322 take action to prevent members from any further picketing, but received no response.

III. Relevant CBA Provisions

Article G10 (the "No Strike" clause) of the CBA states: "The Union agrees that during the term of this Agreement, or any extension thereof, it will not cause or permit its members to cause, nor will any member of the Union take part in, any strike of or other interference with any of the Company's operations or picketing of any of the Company's premises . . . ." Def.'s SOF - Ex. 2 at 3.

Article G11 (the "Management Rights" clause) of the CBA states that "the Company retains the exclusive right to manage its business including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to assign and direct the work force and to conduct its operations in a safe and effective manner."  Id.

The CBA further contains a "safety and health" provision. Article G18.01 states, "The Company will continue to make reasonable provisions for the safety and health of its employees during the hours of their employment, and the employees will be expected to cooperate with the Company." Suppl. Compl. ¶ 9.

The CBA also contains grievance and arbitration provisions. Article G8 provides that "a complaint involving the interpretation or application of any of the provisions of this Agreement or a complaint that an employee or group of employees for whom the Union is the bargaining agent has, in any manner, been unfairly treated" may be grieved under the contract. Id. ¶ 10. Article G9 provides that the Union may demand arbitration where "the intent and meaning of one or more of the Articles of the Agreement . . . has been violated by the Company . . .," provided that certain procedural prerequisites have been met. Id. Article G9A permits the Union to demand expedited arbitration of "any grievance involving the suspension of an individual employee." Id. The CBA does not permit Verizon to grieve or to demand arbitration. Id.

This Complaint was filed on February 4, 2009, and supplemented with leave of court on October 6, 2009.[6]

### DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Gaskell v. Harvard Coop. Soc'y, 3 F.3d 495, 497 (1st Cir. 1993), quoting Fed. R. Civ. P. 56(c). "To succeed, the moving party must show

---

[6]The original Complaint involved only the October 2008-January 2009 events surrounding the tool-carrying rule protest. The Supplemental Complaint added the events that began in August of 2009 with the termination of Sem.

that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." Id. The nonmoving party "must adduce specific, provable facts demonstrating that there is a triable issue." Id. (internal quotation marks omitted). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986) (emphases in original). While the opponent is entitled to have its evidence taken as true, it "is not entitled to have the moving party's evidence positively disbelieved." Grubb v. KMS Patriots, L.P., 88 F.3d 1, 4 (1st Cir. 1996).

The sole count in the Complaint before the court alleges breach of the CBA. Verizon seeks (1) damages; (2) injunctive relief; and (3) a declaratory judgment. The most singular aspect of the case is the absence of any ongoing harm or damages for which Verizon seeks relief. Consequently, the court will turn first, as it must, to the issue of jurisdiction. See Steel Co. v. Citizens for a Better Env't., 523 U.S. 83, 88-89 (1998).

I. Damages

The Union argues that any potential claim for damages has been waived by Verizon. In its statement of facts, the Union asserts that no damages were suffered by Verizon as a result of the cited incidents. See Def.'s SOF ¶¶ 30, 34, 38, 45, 48. Verizon does not contest this assertion in its statement of disputed facts. See Pl.'s SOF. Under the Local Rules, "[m]aterial facts of record set forth in the statement required to be served by the

9

moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." L.R. 56.1. This does not appear to be an inadvertent omission by Verizon, as it concedes on the face of its Complaint that "[t]he damages to [Verizon] resulting from these harms are not readily ascertainable." Suppl. Compl. ¶ 24. See also Opp'n at 16 ("The harm from the EI Techs' refusal to transport tools is incalculable.").

II.     Prospective Injunctive Relief

A federal court has limited authority to use its injunctive power to intervene in a labor dispute. By the express terms of the Norris-LaGuardia Act, 29 U.S.C. § 101,

> [n]o court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

A narrow exception was carved out by the Supreme Court in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 254 (1970) (emphasis in original).

> A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity – whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

The First Circuit has interpreted Boys Markets "not [to] establish a generally applicable specific performance remedy" for employers. Latas Libby's Inc. v. United Steelworkers, 609 F.2d 25, 31 (1st Cir. 1979).

While Verizon does not contest the Union's argument that it is not suffering any immediate and ongoing tangible injury, it contends that it has nonetheless suffered "incalculable" harm to date from the Union's actions in the aggregate. This contention gives sufficient reason for pause. As this court stated in a previous labor dispute, "equitable relief is largely prospective and not as a rule intended to remedy past harms." Clear Channel Outdoor, Inc. v. Int'l Union of Painters and Allied Trades, 2007 WL 1231639, at *2 (D. Mass. Apr. 26, 2007). See also Anheuser-Busch, Inc. v. Teamsters Local No. 633, 511 F.2d 1097, 1100 (1st Cir. 1975) ("[W]e reject the contention that the labor injunction is available in the ordinary course of events as an enforcement mechanism.").

Verizon points the court to a series of cases from outside this Circuit that it argues support the proposition that "[w]here unions engage in a pattern of strike activity in violation of a no-strike clause and there is a likelihood of repeat violations in the future, courts have not hesitated to find broad prospective relief warranted." Opp'n at 18. See United Parcel Serv. (New York), Inc. v. Local 804, Int'l Bhd. of Teamsters, 698 F.2d 100, 110 (2d Cir. 1983) ("[A] court may grant a prospective injunction, but only if it finds that the union has engaged in a pattern of strike activity and that there is a likelihood that it may repeat such violations in the future. In an egregious situation, an employer should not be forced to seek injunctive relief repeatedly when the union's conduct has shown flagrant disrespect for the arbitration process that is the quid pro quo for its no-strike promise."); United States Steel Corp. v. United Mine Workers, 534 F.2d 1063, 1078 (3d Cir. 1976) ("[I]n a § 301 suit a

11

federal court may enjoin prospectively a pattern of contract violations . . . ."); CF&I Steel Corp. v. United Mine Workers, 507 F.2d 170, 176 (10th Cir. 1974) ("[I]njunction . . . may or may not turn upon a particular incident and may or may not extend to future conduct."); Old Ben Coal Corp. v. United Mine Workers, 500 F.2d 950, 953 (7th Cir. 1974) (granting broad prospective injunction that incorporated entire CBA).  But see United States Steel Corp. v. United Mine Workers, 519 F.2d 1236, 1245-1246 (5th Cir. 1975) (striking down a prospective injunction that integrated the language of the CBA).

       The only case from this Circuit cited by Verizon that is approximately on point is less than convincing.  In Latas Libby's, a tin manufacturing plant was shut down for a week by a strike protesting new work hours.  In addition to awarding damages against the union for violations of the CBA's "No Strike" clause, the district court also granted prospective injunctive relief ordering the union to "comply with the no-strike provision of the [CBA], which defendants has [sic] in effect with the plaintiffs as well as similar provisions contained in any other [CBA] which the parties may negotiate in the future." 609 F.2d at 26.  Because this was the only violation of the CBA alleged by the employer, the First Circuit held that "[a]lthough we do not say that repeated violations of a no-strike covenant never warrant broad prospective relief, in the absence of any showing here of a continuing course of conduct evidencing the unwillingness of the Union to abide by the no-strike provision of the Agreement, an injunction as broad as that entered by the district court cannot stand." Id. at 31-32.  The court does not believe that the intermittent work interruptions and workplace frictions at issue here, which were undertaken by Union members without any evidence of instigation by the Union leadership, and without any threats by the Union of future

disruptions, is the type of case that the First Circuit envisioned when it held out the possibility of prospective injunctive relief.

Under Boys Markets, Verizon must meet the basic requirements for entitlement to equitable relief: "whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." 398 U.S. at 254.  No ongoing breach of the CBA is alleged, nor anything that rises to the level of "irreparable harm."  Nor can the court say that Verizon will suffer more from the specter of future CBA breaches than the Union would suffer from the loss of its bargained-for right to arbitrate grievances under the CBA.[7] Prospective injunctive relief is simply not called for given the current state of the facts as alleged.

III.   Declaratory Judgment

Although Verizon fails to allege any damages or irreparable harm, the court may nonetheless in its discretion exercise jurisdiction over the requested relief by way of a declaratory judgment by offering its own analysis of the CBA.  The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (mirrored by Fed. R. Civ. P. 57), "does not itself confer subject matter jurisdiction, but, rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis. . . . Consequently, federal courts retain substantial discretion in deciding whether to grant declaratory relief." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995).

---

[7]Apparently recognizing the relatively insignificant harm presented by each incident individually, Verizon describes the alleged CBA breaches as "death by pin pricks."  Opp'n at 17.

For a claim to be ripe in the declaratory judgment context, two prongs must be met – fitness for review and hardship. Id. at 535. See also Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967). Fitness involves the question of whether "the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." Mass. Ass'n of Afro-American Police, Inc. v. Boston Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992) (per curiam). "[T]he hallmark of cognizable hardship is usually direct and immediate harm, [although] other kinds of injuries may occasionally suffice." Ernst & Young, 45 F.3d at 536. "The notion that disputes which turn on purely legal questions are always ripe for judicial review is a myth." Id. at 537. See also Wilton v. Seven Falls Co., 515 U.S. 277, 286-287 (1995) (the Declaratory Judgment Act does not bar a district court from declining to exercise its otherwise proper jurisdiction).

Two of the four alleged CBA violations fail the first prong of the test because they pertain to discrete past incidents that present no threat of recurrence. The only two that appear to offer the possibility of future harm are the prospect of a renewed boycott of voluntary overtime and/or the wildcat picketing. The Union maintains that its members' withdrawal of voluntary overtime is an "innocuous exercise of employees' right[s]." Def.'s Mem. at 18. Similarly, it views picketing – even unsanctioned – as instances of employees "exercising their First Amendment rights." Id. at 20. As to the second prong, "[t]he key question involves the usefulness of a declaratory judgment, that is, the extent to which the desired declaration 'would be of practical assistance in setting the underlying controversy to rest.'" Ernst & Young, 45 F.3d at 537, quoting Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1st Cir. 1994). The court believes that any effort on its part to define in the abstract when picketing is or is not lawful (or appropriate) is a hopeless task

14

given the myriad forms that speech can take in the context of a labor dispute. With respect to any future voluntary overtime boycott, the court would be uncomfortable ordering employees to do what Verizon itself characterizes as a voluntary act. Moreover, no substantial hardship is posed to Verizon as a result. It has the power under Articles P3.05-3.07 of the CBA to mandate that employees perform overtime work during company-declared emergencies. See Def.'s SOF - Ex. 2 at 4-5. Because the court deems the applicable tests to be presently unsatisfied, it will decline to exercise jurisdiction for the purpose of issuing a declaratory judgment.

## ORDER

For the foregoing reasons, the Union's motion for summary judgment is ALLOWED. The Clerk will enter judgment for the Union and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE